Opinion issued August 27, 2009 















In The

Court of Appeals

For The

First District of Texas






NO. 01-08-00591-CV

__________


AIR PRODUCTS AND CHEMICALS, INC., Appellant


V.


ODFJELL SEACHEM A/S, ODFJELL ASIA II PTE. LTD., AND ODFJELL
SINGAPORE PTE. LTD, Appellees






On Appeal from the 61st District Court

Harris County, Texas

Trial Court Cause No. 2006-15916






O P I N I O N

 Appellant, Air Products & Chemicals, Inc. ("AP"), challenges the trial court's
judgment entered in favor of appellees, Odfjell Seachem A/S, Odfjell Asia II Pte.
Ltd., and Odfjell Singapore Pte. Ltd. (collectively "Seachem"), after a jury trial, in
AP's suit against Seachem for Seachem's alleged negligence in discharging
hazardous chemicals from its vessel, the Bow Favour, into a storage tank in which AP
stored other product. In four issues, AP contends that the trial court erred in denying
its motion to amend its pleadings "with respect to the issue of negligence per se," not
instructing the jury on negligence per se, not rendering a judgment notwithstanding
the verdict in favor of AP on negligence per se, admitting the hearsay testimony of
the first officer of the Bow Favour "concerning what he was told by another
crewman," and instructing the jury to apportion liability between Seachem and a
defendant with which AP had settled prior to trial. 

 We affirm.

Factual and Procedural Background

 In its fourth amended petition, AP alleged that the Odfjell Terminals (Houston),
L.P. and Odfjell Terminals USA, G.P., Inc. (collectively "OTH") operated a terminal
and tank farm business in Seabrook, Texas at which AP stored hazardous chemicals
referred to as "MIPA-70." AP further alleged that on March 11, 2005, Seachem, the
owner and operator of the Bow Favour discharged other chemicals, referred to as
"DCPD," from the Bow Favour into a line and shore tank containing AP's MIPA-70,
causing contamination of AP's product. AP sued both OTH and Seachem, asserting
that they were negligent in loading, segregating, handling, and storing the products
and that their negligence caused the contamination. AP also sued OTH for breaching
the parties' contract relating to the storage of AP's product.

 AP and OTH subsequently entered into a settlement. AP and Seachem then
proceeded to a jury trial on AP's negligence claim against Seachem. On April 21,
2008, five days after the start of the jury trial, AP filed a motion for leave to file a
fifth amended petition, seeking to add allegations of negligence per se against
Seachem. The trial court denied AP's motion for leave to add the negligence per se
allegations. 

 At the conclusion of trial, the trial court asked the jury,

Did the negligence, if any, of those named below proximately cause the
contamination in question? 


 a. Terminal [OTH]


 b. Bow Favour [Seachem]


The jury answered "Yes" as to OTH and "No" as to Seachem. Pursuant to the
instructions in the jury charge, the jury did not answer any additional questions. In
accord with the jury's verdict, the trial court then entered a take-nothing judgment in
favor of Seachem and against AP. 


Amendment of Pleadings

 In its first issue, AP argues that the trial court erred in denying its motion to
amend its pleadings "with respect to the issue of negligence per se" because it elicited
testimony at trial showing that Seachem had violated two United States Coast Guard
Regulations and Seachem did not demonstrate any surprise or prejudice arising from
these proposed amendments. AP, citing Zavala v. Trujillo, argues that the trial court
should have granted the amendments because the negligence per se allegations did
not state a new cause of action. 883 S.W.2d 242, 245 (Tex. App.--El Paso 1994, writ
denied).

 When AP filed its motion for leave to file a fifth amended petition, (1) AP argued
that the amendments were mandatory and the addition of the negligence per se
allegations did "not constitute the addition of a new cause of action" because
negligence per se is "merely one method of proving the breach of duty required in any
negligence case." AP further argued that the addition of negligence per se allegations
did not cause Seachem to be surprised or prejudiced because allegations that Seachem
had violated the regulations had already been made in AP's expert reports, which
were provided to Seachem one year prior to trial, as well as in AP's supplemental
interrogatory answers, which AP had provided to Seachem a few weeks before trial. 
AP attached to its motion the proposed fifth amended petition, in which AP included
an additional section entitled "negligence per se." Within this proposed, amended
section of its petition, AP cited the following regulation:

The person in charge of cargo transfer may not approve or continue
cargo transfer unless the following conditions are met:


 . . . . 


 (o) He is in effective communication with the transfer
terminal.


 (p) The person in charge of the transfer terminal has
acknowledged that he is ready to transfer.


46 C.F.R. § 153.975.

 AP also cited the following regulation:

 (a) No person may connect or disconnect a hose, top off a tank, or
engage in any other critical procedures during the transfer
operation unless the person in charge, required by § 156.120(s),
supervises that procedure.


 (b) No person may start the flow of oil or hazardous material to or
from a vessel unless instructed to do so by either person in
charge.


 (c) No person may transfer oil or hazardous material to or from a
vessel unless each person in charge is in the immediate vicinity
and immediately available to the transfer personnel.


33 C.F.R. § 156.160.

 In response to AP's motion, Seachem asserted that the parties' deadline to
amend their pleadings had expired in November 2007. Seachem contended that
allowing AP to amend its pleadings in the requested manner would surprise and
prejudice it. Seachem noted that if AP had timely pleaded negligence per se upon the
specific federal regulations, Seachem would have engaged experts to testify regarding
these specific regulations from the perspective of the Coast Guard to explain in detail
how Seachem had not violated the regulations. In regard to surprise, Seachem noted
that the motion to amend was filed six months after the discovery deadline, and
Seachem asserted that it needed an expert to counter the allegations of negligence per
se based upon the specific regulations. Seachem invited AP to argue anything that
the pleadings supported, and it suggested that AP could even properly argue the
regulations to the jury and that the jury could decide whether the regulations, and any
violations thereof, supported a general negligence finding. But, Seachem contended
that to allow AP to add a specific cause of action, as well as a specific jury
instruction, on the issue of negligence per and the specific regulations would cause
surprise and prejudice. AP responded that since the parties would be arguing the
alleged violations of the regulations to the jury and the violations impact on a finding
of negligence, it was simply seeking to "conform[] the pleadings to the proof." 

 Parties may amend their pleadings within seven days of the date of trial or
thereafter, or after such time as may be ordered by the judge under rule 166, only after
obtaining leave from the trial court, which shall be granted "unless there is a showing
that such filing will operate as a surprise to the opposite party." Tex. R. Civ. P. 63. 
During trial, a "court may allow the pleadings to be amended and shall do so freely
when the presentation of the merits of the action will be subserved thereby and the
objecting party fails to satisfy the court that the allowance of such amendment would
prejudice him in maintaining his action or defense upon the merits." Tex. R. Civ. P.
66. 

 A trial court's decision on whether to allow the amendment of pleadings is
reviewed under an abuse-of-discretion standard. Perez v. Embree Constr. Group,
Inc., 228 S.W.3d 875, 882-83 (Tex. App.--Austin 2007, pet. denied) (citing Ohio
Med. Prods., Inc. v. Suber, 758 S.W.2d 870, 872 (Tex. App.--Houston [14th Dist.]
1988, writ denied)). A trial court has no discretion to refuse the amendment unless
(1) the opposing party presents evidence of surprise or prejudice; or (2) the
amendment asserts a new cause of action or defense, and thus is prejudicial on its
face, and the opposing party objects to the amendment. Greenhalgh v. Serv. Lloyds
Ins. Co., 787 S.W.2d 938, 939 (Tex. 1990); Hakemy Bros., Ltd. v. State Bank &Trust
Co., Dallas, 189 S.W.3d 920, 924 (Tex. App.--Dallas 2006, pet. denied). The party
opposing the amendment generally has the burden to show prejudice or surprise. 
Greenhalgh, 787 S.W.2d at 939. However, the trial court may conclude that the
amendment is, on its face, calculated to surprise or that the amendment would reshape
the cause of action, prejudicing the opposing party and unnecessarily delaying the
trial. Id. at 940; see also Chapin & Chapin, Inc. v. Tex. Sand & Gravel Co., Inc., 844
S.W.2d 664, 665 (Tex. 1992) (distinguishing between "formal, procedural"
amendments that "simply conform[] the pleadings to the evidence at trial" and do not
result "in surprise or prejudice" and "substantive" amendments that "clearly change[]
the nature of the trial itself"). In that situation, the opposing party's objection is
sufficient to show surprise. Greenhalgh, 787 S.W.2d at 940 n.3.

 Here, the trial court, in its scheduling order, set the deadline to amend
pleadings in November 2007. On April 16, 2008, the parties commenced the jury
trial, which was limited to AP's general negligence cause of action against Seachem. 
On April 21, 2008, five days after the jury trial commenced, AP, with its motion to
amend its pleadings, sought to insert a theory of negligence per se based upon
purported violations of specific Coast Guard regulations. Based upon the arguments
put forth by AP, the trial court could have reasonably concluded that AP's negligence
per se theory was distinct from the other theories that AP had presented in its live
petition, which were based upon Seachem's alleged failure to exercise reasonable
care and general negligence in the "line-alignment, loading, segregation, handling,
and/or storage" of the products at issue. (2) The distinction between AP's proposed
negligence per se allegations and those made by AP in its live petition is further
evidenced by the fact that, in addition to this pleading amendment, AP proposed a
specific jury question that would have asked the jury to determine whether AP had
violated the subject regulations, not whether AP's negligence, i.e., AP's failure to
exercise ordinary care in loading or handling the products, had proximately caused
the contamination. 

 As explained by the Texas Supreme Court, "[n]egligence per se is a tort
concept whereby a legislatively imposed standard of conduct is adopted by the civil
courts as defining the conduct of a reasonably prudent person," and "[i]n such a case
the jury is not asked to judge whether or not the defendant acted as a reasonably
prudent person would have acted under the same or similar circumstances" because
"the statute itself states what a reasonably prudent person would have done." Carter
v. William Sommerville and Son, Inc., 584 S.W.2d 274, 278 (Tex. 1979). In a
negligence per se action, "the trial court merely has the fact finder decide if the
tortfeasor committed the act proscribed by the statute and if the act proximately
caused injury." Borden, Inc. v. Price, 939 S.W.2d 247, 250 (Tex. App.--Amarillo
1997, writ denied). Thus, while negligence per se might be characterized as "merely
one method of proving" negligence, and while negligence per se has been determined
to be a cause that is not "separate and independent from a common-law negligence
cause of action," see Zavala, 883 S.W.2d at 245, the trial court could have reasonably
concluded that the mid-trial addition of AP's negligence per se allegations, based
upon the alleged violations of the specific regulations, would result in the reshaping
of AP's general negligence cause of action and would cause a delay in the trial
proceedings.

 Zavala v. Trujillo, relied upon by AP, is factually distinguishable, but we also
express our disagreement with its broad holding. 883 S.W.2d 242, 245 (Tex.
App.--El Paso 1994, writ denied). In Zavala, the plaintiff alleged that he sustained
injuries while water skiing as a result of the defendant boat owner's negligent
operation of the boat and failure to instruct the plaintiff on how to water-ski. Id. at
244. The plaintiff made no reference to statutory violations in his petition. Id. At
trial, in response to the plaintiff's questioning, the defendant agreed that his boat did
not have a rear-view mirror and that there was not an observer on the boat when the
plaintiff was injured. Id. However, the defendant contended that he was able to
watch the plaintiff, and he denied that the suggested measures could have prevented
the plaintiff's injury. Id. 

 The plaintiff then sought to elicit from the defendant testimony concerning
statutory mandates regarding the use of mirrors and observers when towing skiers. 
Id. The defendant objected to any reference to these statutory mandates, and the trial
court sustained the objection and denied the plaintiff's request for a trial amendment
and jury instruction on negligence per se. Id. The court of appeals reversed, holding
that the plaintiff's petition, which included "general allegations" of negligence, gave
"fair notice that [the plaintiff was] not relying solely on the specific acts pleaded" and
that the plaintiff's trial amendment "merely attempted to specify an act falling under
the general allegation of failing to operate the boat in a safe manner." Id. at 248. The
court in Zavala then suggested that the plaintiff also would have been entitled to a
jury instruction that the violation of the statute mandating mirrors and observers
constituted negligence per se. Id. at 249. The court found that the defendant would
not be surprised or prejudiced because a trial exhibit list made reference to the Texas
Water Safety Act, which included the challenged statutory mandates. Id. The court
simply discounted the defendant's arguments and his evidence that he would have
been prejudiced by the plaintiff's mid-trial attempt to alter the ultimate jury question
from one of general negligence to one of negligence per se based upon specific,
statutory violations. 

 Here, unlike in Zavala, the trial court did not bar AP from discussing the
regulations at trial as potentially relevant to determining whether Seachem was
generally negligent. To the extent the holding in Zavala merely allowed the plaintiff
to introduce and discuss the statutory violations as being potentially relevant to the
general negligence allegation, such a holding is unremarkable and is consistent with
the trial court's treatment of the instant case. However, as stated above, under certain
circumstances, a trial court has the discretion to conclude that a mid-trial attempt to
seek a formal trial amendment on the issue of negligence per se, as a means for
subsequently requesting a specific negligence per se jury instruction tracking specific
regulations, could result in the reshaping of litigation such that it would prejudice and
surprise a defendant. 

 In the instant case, Seachem objected to AP's amendment and argued to the
trial court that it was surprised by the amendment and would be prejudiced. Seachem
complained that, if the trial court allowed the amendment, it would need to designate
additional witnesses to testify as to the cited regulations and that it would need to
conduct additional discovery related to AP's newly asserted claims that Seachem's
alleged violations of these specific regulations established negligence as a matter of
law. On appeal, Seachem elaborates on its trial court argument, noting that, if the
amendment had been allowed, the issues presented to the jury at trial would have
been "dramatically different." For example, as Seachem notes, it would have focused
and presented additional evidence on whether the Bow Favour crew maintained
"effective communication" during the cargo transfer and whether the appropriate Bow
Favour crew member was in the "immediate vicinity," because these are critical
statutory terms upon which a negligence per se finding would likely have been based. 
Seachem further notes that it would have needed to present expert witnesses "to
further address the meaning of the regulations" and whether Seachem violated those
regulations. Instead, although the parties discussed and presented evidence on the
regulations to the jury, Seachem focused its defense on the concepts of ordinary care
and negligence. Finally, Seachem notes that, at trial, it would have challenged
whether the cited regulations set forth a standard of care that would have allowed for
the jury to find that the violation of the regulations qualified as negligence per se. 

 Thus, the trial court could have reasonably concluded that the amended
pleadings, including the negligence per se allegations, would have reshaped the
litigation, prejudicing Seachem and possibly delaying the trial, and, thus, the trial
court did not abuse its discretion by striking AP's amended petition. See Perez, 228
S.W.3d at 882-83 (holding that it was reasonable for trial court to conclude that
amendment seeking to add claims for negligence per se and gross negligence to 
negligence case was calculated to cause surprise and, thus, trial court did not abuse
its discretion in striking amended pleading). Accordingly, we hold that the trial court
did not abuse its discretion in denying AP's motion to amend its pleadings.

 We overrule AP's first issue.

Jury Instruction


 In its second issue, AP argues that the trial court erred in not instructing the
jury on negligence per se and not rendering a judgment notwithstanding the verdict
in favor of AP on the issue of negligence per se because such an instruction was
justified by the trial testimony establishing the pertinent regulatory violations and that
the absence of such an instruction permitted the jury to "minimize the importance of,
or to ignore altogether, relevant regulatory principles."

 We review a trial court's decision to submit or refuse a particular instruction
under an abuse of discretion standard. Shupe v. Lingafelter, 192 S.W.3d 577, 579
(Tex. 2006). For an instruction to be proper, it must (1) assist the jury; (2) accurately
state the law; and (3) find support in the pleadings and the evidence. Tex. Workers'
Comp. Ins. Fund v. Mandlbauer, 34 S.W.3d 909, 912 (Tex. 2000) (citing Tex. R. Civ.
P. 278). 

 AP, in its proposed jury charge filed with the trial court, asked the trial court
to submit an instruction that Seachem committed negligence per se by violating the
above-identified federal regulations. AP requested that the trial court instruct the jury
as follows:

 The violation of a United States Coast Guard Regulation is
negligence in itself. In that regard, you are instructed that United States
Coast Guard regulations forbid:


 (1) a person in charge of the cargo transfer from
approving or continuing the cargo transfer unless he
is in effective communication with the transfer
terminal;


 (2) a person in charge of the cargo transfer from
approving or continuing the cargo transfer unless the
person in charge of the transfer terminal has
acknowledged that he is ready to transfer;


 (3) a person from connecting or disconnecting a hose
during the transfer operation unless the person in
charge supervises that procedure;


 (4) a person from starting the flow of [DCPD] to or
from a vessel unless instructed to do by either
person in charge; and


 (5) a person from transferring DCPD to or from a vessel
unless each person in charge is in the immediate
vicinity and immediately available to the transfer
personnel.


 A violation of any of the above United States Coast Guard Regulations
is negligence in itself.


(Emphasis added.) (3) AP requested a corresponding question requiring the jury to
determine if Seachem's negligence, whether by failing to use a high degree of care
or by violating the regulations, proximately caused the contamination. AP's proposed
instructions would have allowed the jury to answer "Yes" either by finding that
Seachem breached the proposed, defined standard of care, i.e., a high degree of care,
or by violating one of the cited federal regulations. (4)

 Having held above that the trial court did not abuse its discretion in denying
AP's motion to amend its pleadings to add its allegations of negligence per se, we
further hold that the trial court did not err in refusing AP's requested jury instruction
on the issue of negligence per se, which would have required the jury to find Seachem
negligent if it found that Seachem had violated the identified federal regulations. 
Moreover, having held that the trial court did not abuse its discretion in denying AP's
motion to amend its pleadings and in denying AP's requested jury instruction on the
issue of negligence per se, we further hold that the trial court did not abuse its
discretion in denying AP's motion for judgment notwithstanding the verdict on the
issue of negligence per se. (5)

 We overrule AP's second issue.

Hearsay

 In its third issue, AP argues that the trial court erred in admitting the testimony
of the first officer of the Bow Favour "concerning what he was told by another
crewman, who never testified, about the central issue in the case" because the
testimony constituted hearsay. AP asserts that the central issue on which Seachem's
alleged negligence is based is the "crucial breakdown of communications" between
the Bow Favour and OTH, which AP contends is "attributable solely" to the crew of
the Bow Favour. AP asserts that other "witnesses who attended on the dock and were
responsible for shoreside activities during the discharge of the DCPD testified that
the [Bow Favour] had not been instructed to discharge," and "no one from the [Bow
Favour] communicated with the shoreside personnel" before the discharge. AP
complains that, in spite of this testimony, the trial court allowed the admission of the
testimony of Jan Hamre, the Bow Favour's Chief Officer and "person-in-charge," that
his mate on the Bow Favour had asserted that OTH shoreside personnel had told him
to discharge the DCPD. 

 Seachem argues that Hamre's testimony was not hearsay because he "was
asked about his investigation into the cause of the contamination" and was "permitted
to state the basis of his conclusion, which was that [the Bow Favour] started
discharging as the shore requested." Seachem asserts that Hamre's challenged
testimony, based on his perception, was opinion testimony. See Tex. R. Evid. 701. 
Alternatively, Seachem contends that even if the admission of this testimony was in
error, Hamre's testimony was cumulative of other evidence and was harmless. 

 We review a trial court's admission or exclusion of evidence for an abuse of
discretion. In re J.P.B., 180 S.W.3d 570, 575 (Tex. 2005). The erroneous admission
of evidence requires reversal only if the error probably caused the rendition of an
improper judgment. Tex. R. App. P. 44.1; see also Nissan Motor Co. v. Armstrong,
145 S.W.3d 131, 144 (Tex. 2004). We review the entire record, and we require the
complaining party to demonstrate that the judgment turns on the particular evidence
admitted. Id. The erroneous admission of evidence is harmless if it is merely
cumulative. Armstrong, 145 S.W.3d at 144; Corrales v. Dep't of Family & Protective
Servs., 155 S.W.3d 478, 487 (Tex. App.--El Paso 2004, no pet.) ("Reversible error
seldom occurs when the evidence in question is cumulative and not controlling on a
material issue dispositive of the case."); Crosby v. Minyard Food Stores, Inc., 122
S.W.3d 899, 904 (Tex. App.--Dallas 2003, no pet.) ("The error is harmless if other
competent evidence of the fact in question appears elsewhere in the record."). 
Whether the erroneous admission of evidence is harmful is more a matter of judgment
than precise measurement, and in making that judgment, we may consider the efforts
made by counsel to emphasize the erroneous evidence and whether there was contrary
evidence that the improperly admitted evidence was calculated to overcome. 
Armstrong, 145 S.W.3d at 144.

 At trial, Seachem's counsel asked Hamre whether he believed that the Bow
Favour was responsible for discharging the DCPD into the wrong tank. Hamre
answered, "No," and, in response to further questioning stated, "Because we do it
exactly as we was instructed from shore." AP's counsel objected to this latter
testimony as hearsay, and the trial court sustained this objection. Seachem's counsel
then asserted that Hamre's testimony was not offered to prove "what people told
him." Rather, it was offered to explain why he believed that the Bow Favour was not
at fault. Seachem's counsel explained to the trial court that, as the man responsible
for cargo operations on the Bow Favour, Hamre had a "continuing duty to try and
determine if there's some reason that the ship should be responsible for it." AP's
counsel contended that Hamre should not be permitted to testify, based on hearsay,
that the Bow Favour did not do anything wrong. The trial court then made the
following statement,

 He said he's the one in charge of the ship, and there's something
that happened that he needs to investigate, and then he did an
investigation, under the standard rules, or something to that effect, that
he would be able to respond to what his investigation showed, if that
was his job. So, he's the one in charge. So, he's got to report what
happened. So, if that predicate is laid, that question is all right.


The following exchange then occurred:

 [Seachem's counsel]: . . . [I]f a problem arises on the ship
involving the cargo, what responsibilities, if
any, do you have to determine why that
problem arose?


 [Hamre]: I have to find out what's going on.


 . . . .


 [Seachem's counsel]: Okay. And when you were advised that there
had been a problem of contamination on
shore from cargo discharge from the Bow
Favour, was it your responsibility to
determine if the vessel had any involvement
in that?


 [Hamre]: I go and talk to my second mate about . . .
what happened. . . . But nothing have
happened on the ship, so--


 [Seachem's counsel]: And it's your responsibility to go talk to the
second mate to find out, correct?


 [Hamre]: Yeah.


 . . . . 


 [Seachem's counsel]: Upon your investigation, what was the
conclusion?


 . . . .


 [Hamre]: My conclusion was that there was nothing
wrong happen--didn't happen anything
wrong on the ship.


 [Seachem's counsel]: And what did you base that upon?


 [Hamre]: Because we had started the load discharging
as--


 [AP's counsel]: Objection. Hearsay.


 [Trial court]: It's overruled.


 . . . .


 [Hamre]: We have started discharging, as the shore
request. And, so, I couldn't see anything
wrong.

 (Emphasis added). 

 Assuming that the trial court erred in admitting certain portions of Hamre's
testimony regarding what his second mate had been told by shoreside personnel on
the grounds that the testimony constituted inadmissible hearsay, (6) we must now
determine whether the trial court's error in admitting the testimony was harmful. See
Tex. R. App. P. 44.1(a). Here, although we agree that there is some conflicting
evidence as to whether shoreside personnel had in fact instructed the Bow Favour to
commence discharge operations, the overwhelming weight of the evidence shows that
shoreside personnel with OTH did instruct the Bow Favour to discharge the DCPD. 
For example, Dickie Wayne Schiesser, the OTH loadmaster, testified in his
deposition, which was introduced at trial, that he had instructed the Bow Favour to
start discharging the DCPD. Additionally, in a report, which was prepared by AP's
own adjustor, Paul Foreman, and admitted into evidence, a time line of events reflects
that the dockman opened the cargo valve and "advised the ship that they could line
up and start their pump." This report contained an additional statement that the
adjustor had "found no evidence of direct contribution from the Bow Favour" and
that the Bow Favour's mate "simply opened the manifold valve and started the deep-well pump on the tank containing the DCPD when so ordered by the dockman." 
(Emphasis added). 

 Other evidence, some of which was prepared directly by OTH, indicated that
OTH personnel bore the responsibility for the contamination. For example, an OTH
memorandum regarding the "root cause analysis" for the incident, which was
introduced into evidence, included the following passage:

 Interview with the dock operator responsible for the transfer,
revealed he was involved with filling the lines earlier, prior to the ship's
arrival. He was also the operator that conducted the pre-transfer
conference, labeled the jetty line hoses and initiated the culprit transfer. 
The operator's statement indicates that he relied on his memory for
labeling and hooking up the jetty line and he transposed the jetty line
numbers for DCPD and MIPA-70. During an interview he admitted he
did not walk out the lineup prior to initiating the transfer as is [OTH]
strict policy. 


(Emphasis added). This root-cause analysis also included the conclusion that the
contamination "was the result of operator error," and it made no mention of the Bow
Favour. 

 Finally, AP's own expert, Captain James Haley, testified that he had reviewed
Schiesser's deposition testimony. Haley understood Schiesser's deposition testimony
as establising that Schiesser had instructed the ship to start cargo operations. 
Recognizing that Schiesser's deposition and trial testimony conflicted, Haley
explained that it appeared as if Schiesser was adamant at trial that he had not
instructed the ship to start cargo operations and had simply misunderstood the
deposition questions. Nevertheless, there was a significant amount of evidence
presented at trial, in addition to the limited, challenged testimony provided by Hamre,
that the Bow Favour had been instructed by shoreside personnel to start the discharge
of the DCPD. 

 Additionally, we note that in closing arguments, Seachem's counsel
emphasized Foreman's report, including the passage that the Bow Favour started to
discharge as "ordered by the dockman." Seachem's counsel also emphasized
Schiesser's own testimony that he had ordered the Bow Favour to start discharging
the DCPD. Seachem did not place similar emphasis on Hamre's testimony
concerning what his mate had told him. Accordingly, to the extent that the trial court
erred in admitting portions of Hamre's testimony about what his mate on the Bow
Favour had been instructed to do by OTH shoreside personnel, we hold that the error
was harmless because such evidence was cumulative of a significant amount of more
compelling evidence from OTH and AP representatives. (7)

 We overrule AP's third issue.

Apportionment of Liability

 In its fourth issue, AP argues that the trial court erred in instructing the jury to
apportion liability between Seachem and OTH because the jury charge's requiring of
a "direct comparison of fault" between OTH and Seachem "in simple percentage fault
numbers" "likely led to the erroneous result." AP complains that the trial court
instructed the jury to apportion liability between OTH and Seachem over repeated
objections and that the "allocation of fault and application of settlement credits
between contract and tort defendants is not permitted."

 A trial court has broad discretion in submitting its jury charge, and we review
a complaint regarding the submission of jury questions for an abuse of discretion. 
In re D.R., 177 S.W.3d 574, 581 (Tex. App.--Houston [1st Dist.] 2005, pet. denied).

On appeal, we reverse for error in the jury charge only, if after considering the record
as a whole, including the pleadings, the evidence presented at trial, and the charge in
its entirety, we conclude the error probably caused rendition of an improper verdict
or probably prevented the appellant from presenting the case to the appellate court. 
See Tex. R. App. P. 44.1; Wal-Mart Stores, Inc. v. Johnson, 106 S.W.3d 718, 723
(Tex. 2003); Jordan v. Sava, Inc., 222 S.W.3d 840, 847 (Tex. App.--Houston [1st
Dist.] 2007, no pet.). "Submission of an improper jury question can be harmless error
if the jury's answers to other questions render the improper question immaterial." 
City of Brownsville v. Alvarado, 897 S.W.2d 750, 752 (Tex. 1995). "A jury question
is considered immaterial when its answer can be found elsewhere in the verdict or
when its answer cannot alter the effect of the verdict." Id. "Submission of an
immaterial issue is not harmful error unless the submission confused or misled the
jury." Id. "When determining whether a particular question could have confused or
misled the jury, we consider its probable effect on the minds of the jury in the light
of the charge as a whole." Id. (citations omitted). 

 During the charge conference, AP generally objected to questions one and two
of the jury charge on the ground that there should be "no apportionment." AP
requested that the trial court modify these questions so that "the jury not be allowed
to apportion liability between [OTH] and [Seachem]." The trial court overruled this
objection, and, as set out above, submitted question number one, which asked the
jury,

 Did the negligence, if any, of those named below proximately cause the
contamination in question? 

 

 a. Terminal [OTH]


 b. Bow Favour [Seachem]


The trial court also submitted, over objection, question number two, which provided,

If you have answered "Yes" to Question 1 for the Bow Favour, then
answer the following question. Otherwise, do not answer the following
question.


The percentages you find must total 100 percent. The percentages must
be expressed in whole numbers. The negligence attributable to any one
named below is not necessarily measured by the number of acts or
omissions found.


What percentage of the negligence that caused the occurrence do you
find to be attributable to each of those listed below and found by you, in
your answer to Question 1, to have been negligent?


 a. Terminal [OTH]


 b. Bow Favour [Seachem]


In response to the first question, the jury answered "Yes" as to OTH and "No" as to
Seachem. Because the jury found that Seachem's negligence did not proximately
cause the contamination in response to question number one, pursuant to the trial
court's instruction, the jury did not even consider question number two. 

 Thus, regardless of whether the trial court erred in naming OTH in the jury
charge in question number one and in asking the jury to apportion negligence
between Seachem and OTH in question number two, we conclude that any question
in the charge requiring apportionment between Seachem and OTH "was plainly
immaterial" in light of the jury's finding that Seachem's negligence did not
proximately cause the contamination. See City of Brownsville, 897 S.W.2d at 752;
see also Hernandez v. Atieh, No. 14-06-00582-CV, 2008 WL 2133193, at *4 (Tex.
App.--Houston [14th Dist.] May 20, 2008, no pet.) (mem. op.) (holding that jury's
finding that defendant was not negligent rendered erroneous submission of
responsible third party immaterial because once jury found that defendant's
negligence did not proximately cause the accident, its finding that responsible third
party's negligence did cause accident "could not have altered the effect of the
verdict"). 

 Moreover, considering the charge in its entirety, the submission of OTH as a
potentially negligent party "could not have misled or confused the jury" because the
jury charge also included the instruction that "[t]here may be more than one
proximate cause of an event." See Hernandez, 2008 WL 2133193, at *4. 
Specifically, the jury was instructed,

"Proximate cause" means that cause which, in a natural and continuous
sequence, produces an event, and without which cause such event would
not have occurred. In order to be a proximate cause, the act or omission
complained of must be such that a person using ordinary care would
have foreseen that the event, or similar event, might reasonably result
therefrom. There may be more than one proximate cause of an event. 


(Emphasis added.) Based upon this instruction, the jury could not have been misled
into believing that it had to choose between finding OTH or Seachem negligent. See
id. Furthermore, in question number two, which the jury did not reach, the trial court
specifically instructed the jury that it could only apportion liability as between those
it had found to be negligent in response to question number one.

 Finally, the record as a whole shows that the naming of OTH in question
number one did not cause the rendition of an improper verdict because, throughout
trial, both parties presented evidence that Schiesser, the OTH loadmaster, had made
critical errors in writing the wrong line numbers through which the MIPA-70 and
DCPD were to load and discharge and made additional critical errors in connecting
the hoses in which the products were to be transferred. Seachem also presented
evidence that Schiesser, or other shoreside personnel, had instructed the Bow Favour
to discharge the DCPD and that Schiesser had admitted direct fault for the
contamination immediately after the incident while on the scene. AP did not object
or contend that the evidence pertaining to OTH's negligent acts was inadmissible or
irrelevant during the trial. Rather, AP's only objection was to the reference to OTH
in the jury instruction. Because one of Seachem's main theories at trial was that OTH
bore responsibility for the incident, and because AP did not object to the evidence
related to OTH's conduct, the jury would have been free to conclude that OTH's
negligence caused the incident and to find that Seachem was not negligent, regardless
of whether the jury charge contained any direct references to OTH. 

 Accordingly, we hold that the submission of OTH in question number one, and
the submission of question number two regarding apportionment, which the jury did
not even consider in accord with its answer to question number one in the jury charge,
did not constitute reversible error.

 We overrule AP's fourth issue.



Conclusion

 We affirm the judgment of the trial court. 


 

 Terry Jennings

 Justice


Panel consists of Justices Jennings, Keyes, and Higley.

1. In this motion, AP also sought to eliminate all causes of action against OTH. The trial
court granted this portion of the motion, and this ruling is not at issue on appeal.
2. It must be emphasized that, in denying the formal pleading amendment, the trial court
did not preclude AP from presenting evidence on the parties' conduct as it related to
the cited regulations. In fact, as previously noted, even without this amendment,
Seachem invited AP to argue to the jury that the regulations could be relevant to AP's
general negligence cause of action. As is discussed in more depth in regard to the jury
charge issue, Seachem primarily objected to AP's efforts to seek and obtain, in the
midst of trial, a negligence per se amendment as a basis to request a jury instruction
providing that any violation of the cited regulations by Seachem constituted
negligence per se. Seachem stressed that AP's efforts would result in surprise and
prejudice on the ground that AP sought to alter the standard of care after the parties
had already presented evidence in several days of trial. 
3. AP also requested that the trial court instruct the jury that Seachem was negligent,
outside of any regulatory violation, if it had failed to use a "high degree of care." AP
does not complain on appeal about the trial court's refusal to define negligence as the
failure to use a "high degree of care" and the trial court's definition of negligence
being based upon the exercise of ordinary care.
4. However, contrary to its arguments on appeal, in its proposed jury charge, AP did not
request an entirely separate question on negligence per se.
5. We note that AP does not provide any briefing specifically related to the trial court's
denyial of its motion for judgment notwithstanding the verdict. In fact, AP's
complaint about the trial court's denial of its motion is dependent upon on its
argument that it was entitled to amend its pleadings and receive a jury instruction on
the issue of negligence per se. To the extent that AP seeks to raise any additional
issue regarding its motion for judgment notwithstanding the verdict, we hold that AP
has waived any such issue for review. See Tex. R. App. P. 38.1(h).
6. AP does not challenge Hamre's testimony that he conducted an investigation and
determined that the Bow Favour did not err in discharging the DCPD.
7. AP asserts in its reply brief that "the only admissible evidence before the jury was that
the ship began pumping the contaminant ashore without warning to shoreside
personnel." However, Schiesser, in his deposition testimony, and the above-cited
reports, which were admitted into evidence, indicate that the Bow Favour had been
instructed to start the discharge of the DCPD.